*In re* MARRIAGE OF MELANIE T. ROSEN, Petitioner-Appellant, and JACK M. ROSEN, Respondent-Appellee.

First District (5th Division)   No. 83—1062

Opinion filed July 27, 1984.

Joel S. Ostrow, of Chicago, for appellant.

Jeffrey Cole and Andrew T. Staes, both of Chicago (Jeffrey Neal Cole, Ltd., Sanford Kirsh, and Kirsh & Berman, Ltd., of counsel), for appellee.

JUSTICE LORENZ delivered the opinion of the court:

Petitioner appeals from the denial of her motion to modify or vacate the final judgment in this dissolution of marriage action. She challenges the classification, valuation and apportionment of property;

the trial court's failure to award maintenance; the adequacy of child support; and the failure to provide for college education. For reasons set forth below, we affirm in part, reverse in part and remand this cause to the circuit court for further proceedings.

The parties were married April 8, 1960, and had four children, of whom two were minors at the time judgment was entered. Grounds for dissolution, custody and visitation were uncontested; the financial aspects of the dissolution were tried in the circuit court of Cook County during June of 1982. The preponderance of trial testimony addressed the nature and value of a voting trust agreement which represented 14,373 shares of stock in Furst & Furst Corporation, a collection company. The parties stipulated that in 1961, petitioner's father, Louis Lewis, transformed his then sole proprietorship into a corporation and issued 10,000 shares of stock. Of the original issue, petitioner's name appeared on 2,000 shares; these shares split in 1967 and became 14,373 shares, the marital or nonmarital nature and the value of which were subjects of dispute. Additional shares of Furst & Furst, given in the mid-1970's, were stipulated to be the nonmarital property of petitioner.

Stipulations were also entered concerning: the $150,000 value of the marital residence in Lincolnwood; marital accounts at the time of petition totalling $119,000; the equity value in respondent's Morton Grove residence purchased with $30,000 from the marital accounts; jewelry, fine art and silver at the Lincolnwood residence valued in an insurance policy at $74,129; and the terms of certain trusts for the benefit of the children. Tax returns, insurance policies, stock alienation and other agreements were stipulated for admission into evidence, subject to cross-examination of witnesses. The parties stipulated to a letter, dated June 1, 1982, from American National Bank, stating that records from 1961 through 1970 no longer existed.

Respondent testified that he owned and operated Continental Collections, Incorporated, a collection company formed by him in 1976. He stated that the only funds he received from the company were repayments of loans, about $11,000 in the preceding year, and reimbursements of business expenses. Concerning the Furst & Furst stock, respondent testified that he and petitioner had discussed a purchase with petitioner's father in 1961 or 1962, and respondent recalled handing a check to petitioner's father in exchange for the stock. He stated that the check was drawn on the American National Bank from funds received as wedding gifts and deposited in joint checking and savings accounts. Respondent said that he could not recall who wrote the check or the amount of the check.

Petitioner testified that she had a bachelor's degree in education and was certified to teach, but that she had not taught for over 11 years. She stated that her current part-time employment at Furst & Furst paid about $75 weekly. As to the family standard of living, she testified that the family owned horses, employed domestic help, purchased clothing at Marshall Field's, Saks' and Bonwit's, and vacationed at Hilton Head, La Costa and Scottsdale. Respondent stated that two of the children had had extraordinary medical expenses in the last few years.

Concerning the Furst & Furst stock, petitioner testified that her father gave her the stock as a gift in 1961. She stated that she received $24,000 in dividends from Furst & Furst in 1981, and $8,000 in 1982. On cross-examination, petitioner admitted that when she was deposed, she stated that she had purchased the stock from her father using "bank books" from the American National Bank. Petitioner also was questioned at length concerning withdrawals from the marital accounts in the amount of $60,000 and withdrawals from the trust accounts of the children during the period from filing of the petition for dissolution until the trial. On redirect, petitioner explained the difference between her trial and deposition testimony as resulting from a conversation with her father shortly after the deposition.

Petitioner's father, Louis Lewis, testified that in 1961 he gave 2,000 shares of Furst & Furst stock to his daughter and a like amount to his then 15-year-old son. He stated that he was surprised to hear that his daughter had testified differently in her deposition. Lewis testified that as chairman of Furst & Furst, he knew that the 107,000 outstanding shares were owned by 16 shareholders, and that a block of 15,000 shares had recently been sold at $13 per share. In addition, he produced original promissory notes in the amount of $60,000 which he said represented recent loans to his daughter.

During cross-examination, Lewis admitted that he filed Federal gift tax returns for the years 1956, 1960 and 1973 through 1979, but he did not file a gift tax return in 1961. He admitted that the recent seller of Furst & Furst stock, a former employee of the corporation, had been paid on a lower basis than was provided in the repurchase agreement, but he explained that exercise of the agreement was optional with the company. He denied that the seller had been forced from employment. Lewis stated that prior to the recent loans, he "gave" his daughter whatever she needed.

Each party called an expert to value the disputed interest in Furst & Furst; both experts testified to the book value of the corporation. Respondent's expert, a certified public accountant, related three

methods for the valuation of a closely-held corporation. He opined that the "discounted good will" method, recommended by the American Institute of Certified Public Accountants, was the most accurate. This method would yield a market value of $26.48 per share. The second method, based on the repurchase agreement, would yield a value of $44.61 per share, and the third, based on capitalization of earnings, $12.64 per share.

Petitioner's expert, a business appraiser, testified that direct appraisal of the minority interest in the company, as presented by the voting trust agreement, was the best method of valuation. He stated that his appraisal accounted for three factors: the recent transaction of a comparable block of shares, the book value reduced by a factor acceptable to the Internal Revenue Service, and the dividend capacity of the stock. Independently, these factors generated values of $13, $12.36 and $15 per share, respectively. According to petitioner's expert, the average of these figures represented an accurate value for the stock at $13.45 per share.

Petitioner was recalled to the stand to testify that during the trial, she had found bank records in the crawl space of the Lincolnwood residence. The records consisted of partial check registers for accounts at American National Bank, Bank of Lincolnwood and the Northern Trust covering limited periods in the years 1960 through 1962. She stated that her review of the records revealed no checks written to Louis Lewis or Furst & Furst.

The trial court made an explicit finding that the testimony of petitioner and her father was impeached and was not believed. The court found respondent's testimony to be believable. The trial court determined that 14,373 shares of stock in Furst & Furst were marital property, and valued the stock at $19.31 per share.

The trial court set apart nonmarital stock worth $84,453 to petitioner, and it assigned to respondent his nonmarital trust paying $34,000 annually. Account balances held by petitioner totalled $17,116 and those of respondent, $54,200; these accounts were awarded each to its holder, but the extent to which the accounts were or were not included in the $119,000 figure representing marital accounts at the time of petition does not appear. The trial court stated that respondent would be responsible for $16,500 in debts incurred by him, and that petitioner would be responsible for the "alleged" indebtedness to Louis Lewis.

The apportionment of marital property may be summarized as follows:

Petitioner

| Property | Value |
|---|---|
| Furst & Furst stock ($277,000 less $75,000 payment to respondent) | $202,000 |
| Lincolnwood residence ($150,000 less $75,000 payment to respondent) | 75,000 |
| Jewelry, fine art and silver | 74,000 |
| Received from marital accounts from date of petition | 64,000 |
| | $415,000 |

Respondent

| Property | |
|---|---|
| Payment from petitioner for interest in Furst & Furst | $75,000 |
| Payment from petitioner for interest in Lincolnwood residence | 75,000 |
| Received from marital accounts from date of petition | 58,000 |
| | $208,000 |

The trial court found each party capable of providing for needs from marital and nonmarital property being awarded, and found each party capable of self-support by employment. The court awarded $250 per child per month to be paid by respondent to petitioner for support of the minor children. The court found that son Edward, 21 years old, was entitled to receive trust assets of $49,000 and had received $39,000 from trust accounts in the two years preceding judgment, and found further that David, Kenneth and Mitchell each had trust accounts. The decree recites that Edward will be responsible for his own educational expenses, that David has the ability to pay his college expenses, and that payment of future college expenses for Kenneth and Mitchell would be governed by section 513 of the Illinois Marriage and Dissolution of Marriage Act.

Petitioner filed her motion to modify or vacate the decree on October 6, 1982, alleging *inter alia* that the discovery of new evidence warranted modification. The new evidence consisted of an affidavit by a manager at the American National Bank stating that a further search of bank records indicated the parties' joint account was opened

in April of 1962 and neither party had any account in 1961. The trial court denied petitioner's motion on all grounds and ruled that petitioner failed to exercise due diligence in discovering the new evidence; the court added that the evidence was not of such a conclusive nature as to affect the court's rulings. Petitioner filed a notice of appeal on May 2, 1983.

OPINION

Petitioner first contends that the trial court's classification of Furst & Furst stock as marital property was contrary to the manifest weight of the evidence. She argues that the parent-child transaction gave rise to a presumption of gift which could be overcome only by clear and convincing evidence. Because respondent's testimony was not clear and convincing, and because all of the documentary evidence supported petitioner's version of events, she concludes that the manifest weight of the evidence established the nonmarital nature of the stock.

Section 503 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (Ill. Rev. Stat. 1981, ch. 40, par. 503) governs the classification of property. Our supreme court has interpreted the Act as creating a rebuttable presumption that property acquired after the marriage is marital; the party seeking the benefit of an exception, including the exception of property acquired by gift, bears the burden of proof. (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 216, 446 N.E.2d 499; see also *In re Marriage of Smith* (1981), 86 Ill. 2d 518, 529-30, 427 N.E.2d 1239.) In Illinois, a transfer from parent to child is presumed to be a gift (see *O'Donnell v. O'Donnell* (1922), 303 Ill. 31, 37, 135 N.E.28) and the gift presumption may be overcome only by clear and convincing evidence to the contrary. (*Varap v. Varap* (1966), 76 Ill. App. 2d 402, 413, 222 N.E.2d 77.) In the instant case, therefore, the transaction was subject to conflicting presumptions.

■ We believe that the presumptions operated only to fulfill both parties' *prima facie* obligations, and left the trial free to resolve the issue on the facts. Our view is supported by Illinois case law. Generally, a presumption serves to shift to the party against whom it operates the burden of going forward and introducing evidence to meet it; the presumption ceases to operate once contrary evidence is introduced. (*Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 448 N.E.2d 872; E. Cleary & M. Graham, Illinois Evidence sec. 302.5, at 81-82 (4th ed. 1984).) Specifically with respect to conflicting presumptions, Illinois courts have treated such presumptions as though they cancelled. In *Hofmann v. Hofmann* (1983), 94 Ill. 2d

205, 446 N.E.2d 499, the supreme court considered arguments over a parent-to-child gift in the context of the Act's classification provision. Reversing the appellate court and sustaining the trial court's classification, the supreme court concluded that "the trial court's determination was supported by credible evidence, and we are not free to disturb it in light of the statutory presumption." (94 Ill. 2d 205, 216, 446 N.E.2d 499.) Similarly, in *In re Marriage of Wojcicki* (1982), 109 Ill. App. 3d 569, 440 N.E.2d 1028, the parties gave conflicting testimony concerning a transfer of title into joint tenancy. The *Wojcicki* court recognized that such a transfer gives rise to a presumption of gift which may be rebutted only by clear and convincing evidence, but also noted that "the trial court's determination as to credibility was central to its adjudication of the issue." (109 Ill. App. 3d 569, 573-74, 440 N.E.2d 1028.) The court employed a manifest weight of the evidence standard and sustained the trial court's finding despite the applicable presumption. (See also *In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 785-86, 450 N.E.2d 1385.) We conclude that notwithstanding the presumption of gift, the trial court's classification of property should not be disturbed unless contrary to the manifest weight of the evidence.

■■ Judged by this standard, we find that the trial court's determination is supported by the evidence. Respondent testified that in 1961, or perhaps early 1962, he and petitioner had conversations with Lewis during which Lewis said that the couple would gain by the purchase of Furst & Furst shares, perhaps $60,000 per year. Respondent recalled that Lewis came to the couple's Skokie apartment on a weekend afternoon and requested a check which he said would represent the stock purchase. Respondent stated that Lewis was in the living room and petitioner was in the bedroom; respondent went to the bedroom, then returned with a check which he handed to Lewis. This 20-year-old recollection of events contained some degree of detail, and was corroborated to some extent by petitioner's deposition testimony. More important, the trial court believed the testimony.

In contrast, the record reveals ample impeachment of the testimony of petitioner and her father. Petitioner recalled at her deposition that she had purchased the Furst & Furst stock with nonmarital funds from an account at American National Bank; at trial she remembered that the stock was a gift. Lewis' credibility was undermined generally by his statements that he "gave" his daughter whatever she wanted before proceedings in this case, but that he "loaned" large sums of money to her after the commencement of the action. His testimony to the gift itself suffered from his failure to file a gift

tax return covering the transaction and his failure to note any such gift on later returns.

Petitioner's attempt to impeach respondent was less successful. She produced check registers containing months-long gaps and indicating that many unrecorded checks had been issued. Even if we considered the affidavit submitted post-trial, which stated that the parties' account at American National Bank was opened in April of 1962, we would not be compelled to conclude that respondent was substantially impeached. It appears that the couple had several accounts in the relevant time-frame, which included early 1962. Thus, respondent's testimony may be read as consistent with the affidavit, and if inconsistent, only incidentally so.

These facts we glean from the transcript. Of course, the trial judge viewed the demeanor of the witnesses on the stand, and was therefore in a better position to assess their credibility and to resolve conflicts in their testimony. The trial court's classification of Furst & Furst stock as marital property was not against the manifest weight of the evidence.

Petitioner next contends that the trial court erred in denying her post-trial motion to modify or vacate, brought under section 2—1203 of the Code of Civil Procedure, based on newly discovered evidence. A manager at American National Bank stated by affidavit that a search in September 1982 revealed a service charge report which indicated that the parties' joint account was not opened until April of 1962. One of petitioner's attorneys, Errol Zavett, submitted an affidavit in which he stated:

> "During and prior to the trial of this case, evidence was adduced concerning the checking account at American National Bank, which I believe negated the need for further proof of the opening of said checking account.
>
> * * *
>
> During September, 1982, after the ruling in this case, I became aware that American National Bank had discovered a record of the disputed account."

Also attached to the motion was a letter on bank stationery addressed to "Mr. L. H. Lewis, Furst & Furst," referring to a conversation on September 2, 1982, noting enclosure of the service charge report and summarizing its content.

Section 2—1203 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1203) derives without substantive change from section 68.3 of the Civil Practice Act. (See Ill. Ann. Stat., ch. 110, par. 2—1203, Historical & Practice Notes, at 364 (Smith-Hurd 1983).)

The motion is committed to the trial court's discretion (*In re Marriage of Hopkins* (1982), 106 Ill. App. 3d 135, 137, 435 N.E.2d 897), and where based on newly discovered evidence, it must appear that due diligence was used to discover the evidence for trial and that the evidence is so conclusive that it would probably change the result. *In re Marriage of Sanborn* (1979), 78 Ill. App. 3d 146, 150-51, 396 N.E.2d 1192.

■ Aside from the possibility that the bank breached its depositors' confidence (see *Suburban Trust Co. v. Waller* (1979), 44 Md. App. 335, 408 A.2d 758, and authority cited therein), the record in this case fails to show how Lewis caused the service charge report to be discovered. Absent any indication of the method actually used to discover the evidence, the trial court would have been hard pressed to find that petitioner exercised due diligence. On the contrary, the record actively indicates that the evidence was available throughout the pendency of the action and that the evidence was not discovered earlier because the attorneys accepted an incomplete response from the bank. On petitioner's part, the bank's initial response was accepted because petitioner's attorney determined as a matter of trial strategy that further evidence would be unnecessary. "It cannot be the practice of courts to allow important matters to go to trial, and because one party is not satisfied with the results of it, let [that party] go out and try to get facts which will enable him [or her] to do better at another trial, and rely upon such after-ascertained matters as a basis for a new trial." *Chicago & Alton R.R. Co. v. Raidy* (1903), 203 Ill. 310, 317, 67 N.E. 783.

We believe that the trial court properly denied petitioner's motion on the ground that petitioner failed to exercise due diligence to discover the evidence for trial. In addition, we find that the trial court was justified in denying the motion on the alternative ground that the evidence was not of such a conclusive character as to change the result. Respondent testified that the transaction occurred in 1961 or early 1962; whether the testimony is construed as consistent with the service charge report or is construed as mistaken concerning the time of transaction or location of account, petitioner's new evidence raises no irreconcilable conflict. Accordingly, we sustain the trial court's refusal to reopen the case and hear new evidence concerning the classification of Furst & Furst stock.

■ Petitioner next contends that the trial court's valuation of Furst & Furst stock at $19.31 per share was contrary to the manifest weight of the evidence. This court has repeatedly recognized that the valuation of a closely held corporation is subject to no hard and fast

rules, but that all relevant facts should be considered, and the trial court's judgment should be sustained so long as the record supports the valuation. (See *e.g., In re Marriage of Mullins* (1984), 121 Ill. App. 3d 86, 89, 458 N.E.2d 1360; *In re Marriage of Mitchell* (1981), 103 Ill. App. 3d 242, 248, 430 N.E.2d 716.) Here, the trial court heard lengthy testimony from two experts: one valued Furst & Furst at $26.48 per share; the other, $13.45. The $19.31 per share value placed on the stock by the trial court represented book value, and was well within the range of testimony. We conclude that the trial court's valuation of Furst & Furst shares was not contrary to the manifest weight of the evidence.

■ Petitioner next contends that the trial court abused its discretion in apportioning the marital property. Section 503(c) of the Act requires that marital property be divided in "just proportions" considering, *inter alia*,

"(1) the contribution or dissipation of each party *** including the contribution of a spouse as a homemaker or to the family unit;

(2) the value of the property set apart to each spouse;

(3) the duration of the marriage;

(4) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

* * *

(7) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(8) the custodial provisions for any children;

(9) whether the apportionment is in lieu of or in addition to maintenance; and

(10) the reasonable opportunity of each spouse for future acquisition of capital assets and income." (Ill. Rev. Stat. 1981, ch. 40, par. 503(c).)

The trial court in its discretion may make whatever distribution it deems equitable under the circumstances, and review is limited to determining whether the trial court fairly considered the evidence in the context of the factors set forth in section 503(c); distribution will not be disturbed unless no reasonable person would adopt the trial court's view. *In re Marriage of Sheber* (1984), 121 Ill. App. 3d 328, 337-38, 459 N.E.2d 1056.

We have disregarded the questionable mathematical demonstrations contained in petitioner's brief and substituted our own calculations, set out in the facts, which show that petitioner shall receive approximately $415,000 in assets and respondent shall receive approximately $208,000. Given petitioner's continuing custody and responsibility for the minor children, and given respondent's superior opportunity for future acquisition of assets, a division favoring petitioner seems fair. Petitioner's contention that this division constitutes an injustice to her depends in large part upon her assertion that the trial court set apart to respondent his nonmarital trust worth $500,000.

The trial court found: "That respondent is the life beneficiary of a trust established by his father which is paying him the sum of approximately $34,000.00 per year in income, and that said trust is a nonmarital asset." Respondent testified that his father had mentioned that the corpus of the trust was $500,000. Respondent also stated that he had petitioned the trustee for a disbursement from principal, but that the petition had been denied. Although reference was made to the terms of the trust, no document concerning it was entered in evidence, and the foregoing represents the full extent of testimony and findings concerning the trust.

We believe that the trial court abused its discretion in two respects concerning the apportionment of marital property. First, the court's finding that the trust was a nonmarital "asset" valued at its $34,000 per year "income" was clearly erroneous. "Assets" and "income" are separate if not mutually exclusive concepts (see Black's Law Dictionary 108 and 687 (5th ed. 1979)), and the confusion of the two, in this decree at least, significantly prejudiced petitioner. For example, present value is the measure of worth for "assets," but no attempt was made to determine the present value of the trust; the income derived from the trust during the marriage should almost certainly have been characterized as marital, yet the trial court seems to have assumed the opposite without any finding to that effect. The value of the nonmarital assets is an important consideration in the apportionment of marital property (see Ill. Rev. Stat. 1981, ch. 40, par. 503(c)(2)), and the failure of a trial court to determine the value of substantial assets can justify reversal. (*In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 458-59, 426 N.E.2d 1087; *In re Marriage of Olsher* (1979), 78 Ill. App. 3d 627, 635-36, 397 N.E. 2d 488.) Here, the complete dearth of evidence or findings concerning the terms and value of the trust, the nature of the proceeds therefrom, and the effects of these determinations upon other interests related to the disso-

lution rendered the property division arbitrary.

In addition, we believe that the manner in which the property was divided, namely, the award of tangible assets to petitioner and the attendant cash payments of $150,000 from petitioner to respondent, amounted to an abuse of discretion. On this record, it appears that petitioner will be required to sell or impair assets in order to make such payments, whereas respondent possesses more than adequate liquidity to maintain and improve his standard of living for the foreseeable future. We note that where it has been necessary to award large assets to one spouse, the trial court is in a position to fashion offsetting payments flexibly. See, *e.g., In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 387, 399 N.E.2d 1006 (installment payments for interests in business); *In re Marriage of Thompson* (1979), 79 Ill. App. 3d 310, 317, 398 N.E.2d 17 (payment from ultimate sale proceeds for interest in home).

In view of the hotly contested nature of proceedings concerning the Furst & Furst stock, the absence of a clear focus on the more general issues of apportionment is understandable. However, we believe that the statutory mandate to divide property in "just proportions" requires the court to consider all aspects of the couple's economic circumstances, despite the narrow contentions of the parties. On remand, the trial court should determine the nature and value of respondent's interest in the trust, and review its findings affected thereby. The division of marital property should be made in a manner which indicates that initial proportions will remain just when the division is carried out. Because maintenance and child support depend upon apportionment of property (see *In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 1083, 412 N.E.2d 1336) these issues are also remanded for further consideration as necessary. The trial court's findings with respect to the ability of the older children to pay for college are supported by the record, and so we affirm that portion of its decision.

In sum, we affirm the trial court's classification and valuation of Furst & Furst stock as well as its judgment respecting provisions for college education. We reverse and remand the judgment dividing the property and the dependent judgments concerning maintenance and child support; the trial court should take evidence on the nature and value of all substantial assets, except the Furst & Furst stock, and all sources and potential sources of income at the time of the hearing on remand. The trial court should then fashion a division which is practical and just in light of all relevant economic circumstances, providing for maintenance or adjusting child support as necessary.

For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part; remanded for further proceedings.

MEJDA, P.J., and SULLIVAN, J., concur.