# ILLINOIS OFFICIAL REPORTS

***In re Marriage of Price*, 2013 IL App (4th) 120155**

| | |
|---|---|
| Appellate Court Caption | In re: the Marriage of JILL ANNE PRICE, Petitioner-Appellee, and MELVIN LEE PRICE, Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-0155 |
| Filed | March 22, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In the dissolution of a 34-year marriage where the parties were employed and operated several successful businesses, the trial court did not abuse its discretion in awarding petitioner $7,500 per month in maintenance and an equalization payment of $330,275.10, and in requiring respondent to pay $15,000 of petitioner's attorney fees. |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 07-D-361; the Hon. Karen E. Wall, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Steven L. Blakely and Nicolas Boileau, both of Acton & Snyder, LLP, of Danville, for appellant.

Kevin M. Colombo, of Saikley, Garrison, Colombo & Barney, LLC, of Danville, for appellee.

Panel

JUSTICE KNECHT delivered the judgment of the court, with opinion.

Presiding Justice Steigmann and Justice Turner concurred in the judgment and opinion.

**OPINION**

¶ 1   On June 13, 2011, the trial court entered an order dissolving the marriage of petitioner, Jill Anne Price, and respondent, Melvin Lee Price. All other issues were reserved. At a later hearing on pending issues, the court heard evidence and the parties submitted financial affidavits and final written arguments. The court took the matter under advisement. On July 20, 2011, Jill filed a petition for contribution to attorney fees and costs. On August 24, 2011, the court conducted a hearing on Jill's petition for contribution and took the matter under advisement. On October 18, 2011, the court entered its supplemental order to the judgment of dissolution of marriage. This judgment ordered Melvin to pay Jill the following: (1) permanent maintenance in the amount of $7,500 per month; (2) $15,000 toward her attorney fees; and (3) an equalization payment of $330,275.10 within 90 days.

¶ 2   Melvin appeals, arguing the trial court abused its discretion in (1) awarding Jill permanent maintenance in the amount of $7,500 per month; (2) ordering him to pay $15,000 of Jill's attorney fees; and (3) ordering a $330,275.10 equalization payment to be made within 90 days of the court's judgment.

¶ 3   We affirm.

¶ 4                              I. BACKGROUND

¶ 5   On April 23, 1977, Melvin and Jill were married. Two children were born during the marriage, Kate Elizabeth Thorlton (born October 18, 1978) and Kristina Lee Price (born March 14, 1981). Shortly after they married, Melvin and Jill began residing at a home owned by Melvin's parents located on North Bowman in Danville, Illinois, where the parties remained until 2003, when they moved to a residence on Lewis Road in Danville, Illinois.

¶ 6   Since September 2007, Jill has resided on Fairway Drive in Danville, Illinois. At the time of trial, Jill was 61 years of age (born June 4, 1950). She has a high school education. Following high school graduation, Jill worked as a cashier at Zayres department store. She was later promoted to office manager and then became the employee responsible for running the cash office, which she did for approximately 10 years until the parties' first child was

born.

¶ 7     Melvin continues to reside at the former marital residence located on Lewis Road in Danville, Illinois. At the time of trial, he was 66 years of age (born January 2, 1945). Prior to marrying Jill, Melvin was employed as a license examiner at the Danville License Bureau and, thereafter, for the State of Illinois as a marshal for prisoners. In 1974, 1975, or 1976, Melvin and his uncle started their own construction company, Pri-den. Melvin's uncle later retired and Melvin bought out his share and renamed the business Mel Price Company.

¶ 8     Prior to their first child, Jill worked full-time at Zayres, maintained the household, took care of Melvin's daughter from a prior marriage, and worked part-time doing invoicing and answering phones for the construction business. Jill terminated her employment at Zayres one week before their first child was born (1978). Following the birth of their second child, Jill was primarily a homemaker, but she continued to work part-time for the construction business until 1984.

¶ 9     In 1984, Jill and Melvin incorporated the construction business as Mel Price Company, Inc. Jill and Melvin were each made 50% shareholders and named as officers and directors. Jill began working full-time in this business as well as continuing to run the household. During this same year, Jill and Melvin purchased another business, which they named Sand Valley Sand and Gravel, engaged in hauling and delivering sand and gravel. They incorporated this business in 2002, and Jill and Melvin were each made 50% shareholders and named as officers and directors. In 2002, 2003, or 2004, Jill and Melvin began operating a third business, Mel Price Containers, which leases storage containers to various businesses. Mel Price Containers is a sole proprietorship.

¶ 10     Jill continued working full-time for the parties' three businesses until June 2007 at which time she was receiving a yearly salary of $62,000. She also had company benefits, including health insurance, a company phone, a company vehicle, and a simplified employee pension plan matched by the business. Since ceasing to work at the parties' businesses, Jill has not attempted to secure employment elsewhere.

¶ 11     During their marriage, the parties accumulated several pieces of real estate. In 1997, they bought a condominium in Fort Myers, Florida, which was sold in 2001. In 1999, they purchased a second condominium in Pine Island, Florida, which was sold in 2002 or 2003. The proceeds from the sale of these two properties were invested in the parties' businesses. The parties also acquired real estate located on Glen Cove Drive in Fort Myers, Florida; on East Voorhees Street in Danville, Illinois; and what is referred to as the McCloud real estate located in Danville, Illinois. Further, Melvin owns a remainder interest in nonmarital real estate located on Bowman Avenue in Danville, Illinois.

¶ 12     On December 11, 2007, Jill filed a petition for dissolution of marriage. On June 23, 2008, Jill filed a petition for temporary relief. On August 27, 2008, the trial court entered a temporary relief order. By agreement of the parties, Melvin was ordered to make certain payments for Jill's benefit from the funds of Mel Price Containers. This order also provided Melvin was not to make any payments to himself from the parties' businesses unless he paid Jill the same.

¶ 13     In June and November 2009, Jill filed petitions alleging Melvin was in direct civil

contempt of the trial court's temporary relief order. In September 2009, Melvin filed a petition to modify the temporary relief order, requesting he be compensated from the businesses as an employee. Following a February 2010 hearing on these petitions, the trial court found Melvin to be in contempt and issued a purge order in which Melvin was directed to open a personal checking account to pay his personal expenses and was prohibited from using the parties' business accounts or credit cards for personal expenses. This order also provided Melvin could take a salary of $2,000 per week from Sand Valley Sand and Gravel.

¶ 14    In May 2011, Jill filed a petition for a finding of dissipation of marital assets. On June 13, 2011, the trial court entered an order dissolving the marriage while reserving all other issues pending between the parties except for grounds of dissolution. A hearing was conducted between June 13, 2011, and June 24, 2011, on the pending issues during which the parties successfully negotiated some issues and the court heard evidence and the parties submitted financial affidavits and final written arguments on the remaining issues. On June 23, 2011, the trial court filed two separate orders: (1) a stipulation and order on partial division of personal property and (2) a stipulation and order on Jill's petition for finding of dissipation. These two separate orders summarized agreements reached between the parties during negotiations on June 14 and June 15, 2011. The court kept the remaining issues under advisement.

¶ 15    On July 20, 2011, Jill filed a petition for contribution to attorney fees and costs. On August 24, 2011, the trial court conducted a hearing on Jill's petition for contribution and took the matter under advisement.

¶ 16    On October 18, 2011, the trial court entered its supplemental dissolution judgment. This judgment ordered Melvin to pay Jill the following: (1) $7,500 per month in permanent maintenance; (2) $15,000 toward her attorney fees; and (3) an equalization payment of $330,275.10 within 90 days.

¶ 17    On November 17, 2011, Melvin filed a motion for rehearing, retrial, modification or vacatur of supplemental dissolution judgment. In this motion, Melvin contended the trial court erred in (1) accepting the personal property values proffered by Jill, (2) awarding the parties' Edward D. Jones account to Jill, (3) ruling he dissipated marital assets by paying attorney fees from the parties' businesses, (4) ordering a $330,275.10 equalization payment, (5) awarding Jill $7,500 per month in permanent maintenance, and (6) ordering him to pay $15,000 of Jill's attorney fees. Also on November 17, Jill filed a motion for reconsideration requesting the court modify its October 18, 2011, supplemental order. On January 25, 1012, the court denied both motions in their entirety.

¶ 18    Melvin appeals, arguing the trial court abused its discretion in (1) awarding Jill $7,500 per month in permanent maintenance; (2) ordering him to pay $15,000 of Jill's attorney fees; and (3) ordering a $330,275.10 equalization payment to be made within 90 days of the court's judgment.

¶ 19                                    II. ANALYSIS

¶ 20                              A. Permanent Maintenance

¶ 21    Melvin argues the trial court erred in (1) calculating his annual income to be in excess

-4-

of $300,000 and (2) awarding Jill $7,500 per month in permanent maintenance.

¶ 22          1. *The Trial Court's Determination of Melvin's Net Income Was*
                 *Not Against the Manifest Weight of the Evidence*

¶ 23     Melvin first asserts the trial court erroneously determined his income to be in excess of $300,000 per year. Melvin argues the calculation used by the court in arriving at an income figure "in excess of $300,000 per year" is "nowhere to be found within the trial court's decision." Further, Melvin contends the court failed to indicate whether the $300,000 figure represents his gross or net income. In contrast, Jill responds the trial court provided a detailed basis for its income determination which it fully laid out in its ruling. We agree with Jill.

¶ 24     In determining the amount of maintenance to be awarded, a trial court considers the parties' income at the time of dissolution as well as potential income. *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1041, 899 N.E.2d 1097, 1103 (2008). "A court's factual finding as to the parties' annual incomes will be reviewed under the manifest-weight-of-the-evidence standard." *Id.* A finding is "against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 61, 920 N.E.2d 1147, 1153 (2009).

¶ 25     The trial court provided a detailed basis for its determination of Melvin's income. In the supplemental dissolution judgment, the court took the following calculations into consideration. Melvin received a weekly salary of $2,000 from Sand Valley Sand and Gravel (awarded to Melvin in the divorce) for a gross monthly salary of $8,667. Melvin also agreed he received social security retirement benefits of $1,722 monthly. The court noted the income claimed by Melvin in his amended financial affidavit, admitted as petitioner's exhibit No. 92, was not accurate and, thus, it looked to the income tax returns and the testimony presented at trial. The income tax returns for Sand Valley Sand and Gravel showed Melvin collected $5,000 per month ($60,000 per year) in rent for equipment and building rental. Further, the court noted the most recent income information for Mel Price Containers (awarded to Melvin in the divorce) revealed the business netted $82,590 for the first six months of 2011, or $13,765 per month. Based on these figures, the court found Melvin's *net income* to be in excess of $25,000 per month, or more than $300,000 per year. In coming to this calculation, the court acknowledged (1) Melvin's testimony he does not actually receive the rental money from Sand Valley Sand and Gravel and (2) the income tax returns were not representative of exactly what transpired within the parties' businesses because both parties testified the businesses paid various personal expenses for the parties and the parties loaned money to the various businesses. In addition, the court noted even if it were to set aside the evidence and accepted Melvin was spending $10,871 per month in expenses and debt retirement as documented in his amended financial affidavit, he still had an income in excess of $25,000 per month with which to meet his expenses.

¶ 26     We reject Melvin's contention the trial court should have averaged his income tax returns for the past three years to properly calculate his income. As this court has recently stated, " '[i]ncome' for tax purposes is not synonymous with 'income' for determining ***

-5-

support." *In re Marriage of Bradley*, 2011 IL App (4th) 110392, ¶ 44, 961 N.E.2d 980. "The purpose of the two calculations are different. While the Internal Revenue Code is concerned with reaching an amount of taxable income, the support provisions in the Dissolution Act are concerned with reaching the amount of *** income" for determining support. *Id.* Here, the court carefully detailed how it arrived at its calculation of Melvin's income and its determination was not against the manifest weight of the evidence. Further, we note–as Jill points out–the court's income determination was based on Melvin receiving a gross salary of $2,000 per week from Sand Valley Sand and Gravel pursuant to a previous order of the court limiting his pay during the pendency of the case. The court order limiting the amount of salary Melvin could receive from his businesses is no longer in effect. Melvin now has discretion and control over his salary from any or all of his businesses.

¶ 27            2. *The Trial Court Did Not Abuse Its Discretion in Awarding Jill*
                   *$7,500 Monthly in Permanent Maintenance*

¶ 28    Melvin next asserts the trial court erred in awarding Jill $7,500 per month in permanent maintenance. We disagree.

¶ 29    When determining the duration and amount of a maintenance award, a trial court must consider the following 12 statutory factors outlined in section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/504(a) (West 2010)):

"(1) the income and property of each party, including marital property apportioned and non[ ]marital property assigned to the party seeking maintenance;

(2) the needs of each party;

(3) the present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having foregone or delayed education, training, employment, or career opportunities due to the marriage;

(5) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or is the custodian of a child making it appropriate that the custodian not seek employment;

(6) the standard of living established during the marriage;

(7) the duration of the marriage;

(8) the age and the physical and emotional condition of both parties;

(9) the tax consequences of the property division upon the respective economic circumstances of the parties;

(10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(11) any valid agreement of the parties; and

(12) any other factor that the court expressly finds to be just and equitable."

No single statutory factor is determinative and the trial court is not limited to a review of the

section 504(a) factors when setting a maintenance award. *Ir re Marriage of Murphy*, 359 Ill. App. 3d 289, 304, 834 N.E.2d 56, 68 (2005).

¶ 30 An award of permanent maintenance may be appropriate where one spouse is not employable or is only employable at a lower income as compared to the parties' standard of living during the marriage. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 305, 932 N.E.2d 543, 557 (2010). Permanent maintenance may also be appropriate where one spouse raised and supported the family during a lengthy marriage. *Id.* Rehabilitative maintenance may be appropriate where the spouse is or may become employable at an income that would provide the same standard of living the parties enjoyed during their marriage. *Id.* A trial court's determination as to the propriety of a maintenance award is presumed to be correct and will not be reversed on appeal absent an abuse of discretion. An abuse of discretion occurs only where no reasonable person would take the view adopted by the trial court. *Id.* at 292, 932 N.E.2d at 548.

¶ 31 In this case, the trial court's $7,500 per month permanent maintenance award was not an abuse of discretion. At the time of the proceedings, Jill was 61 years of age and had a high school education. Following high school graduation, she worked for some time as a cashier at Zayres department store and later as an office manager. Shortly before giving birth to their first daughter, Jill terminated her employment with Zayres. She then began working part-time for the parties' business that eventually became known as Mel Price Company, Inc. After the birth of their second daughter, Jill began working full-time for the parties' businesses, in addition to taking care of the home, the parties' biological daughters, and Melvin's daughter from a prior marriage. Jill continued working for the parties' businesses until 2007, at which time she was receiving an annual salary of $62,000 and benefits, including health insurance, a company car with some gas furnished, a company phone, and an employee pension plan. At the time of the hearing, Jill was unemployed and had not attempted to seek employment elsewhere.

¶ 32 The parties were married for 34 years. During the lengthy marriage, the parties enjoyed a high standard of living. They spent over $1 million on toys, collectibles, dolls, and other items without debt. They owned condominiums in Florida and took several vacations every year paid for from the businesses' funds.

¶ 33 According to an amended financial affidavit filed by Jill, her total monthly income was $0.00 and her total monthly expenses equaled $9,392.28. After deducting mortgage payments for two properties awarded to Jill because Melvin was ordered to pay off those mortgages, the trial court determined her total monthly expenses to be $7,061.72. The court further found Jill had no reasonable prospects of employment as her work experience would only qualify her for basic entry-level positions because she had no formal training and no computer experience or knowledge.

¶ 34 The trial court determined $7,500 per month in permanent maintenance was appropriate. The court acknowledged Jill may have assets–based on property awarded from the marriage–but noted she should not be required to spend down her assets when Melvin had the ability to pay maintenance that would cover Jill's reasonable expenses. See *In re Marriage of Mayhall*, 311 Ill. App. 3d 765, 768, 725 N.E.2d 22, 25 (2000) (" '[W]here the

spouse from whom maintenance is sought has sufficient income to meet his own needs while meeting those of his spouse, the spouse seeking maintenance is not required to sell her assets or impair her capital in order to maintain herself in the manner established during the marriage.' (Emphasis omitted.)" (quoting *In re Marriage of Thornton*, 89 Ill. App. 3d 1078, 1088, 412 N.E.2d 1336, 1344 (1980))). Based on this evidence and the lifestyle the parties enjoyed during their marriage, the court did not abuse its discretion in awarding Jill $7,500 per month in permanent maintenance.

¶ 35    Melvin likens this case to *In re Marriage of Bratcher*, 383 Ill. App. 3d 388, 890 N.E.2d 1232 (2008). This case is distinguishable from *Bratcher*. In *Bratcher*, this court–in a divided decision–reversed an ex-wife's award of maintenance where she had not only been awarded $1,634,719 in marital assets, but she was also receiving $8,193 per month in proved rental income and nearly $5,845 in interest income derived from an $876,759 lump-sum payment and had potential for making additional income as a realtor. *Id.* at 389, 890 N.E.2d at 1233-34. This court noted the ex-wife's income combined with the maintenance awarded would have resulted in the ex-wife receiving $12,000 more per month than the ex-husband. *Id.* at 388, 890 N.E.2d at 1234. Here, the only income-producing property awarded to Jill was the Voorhees Street property, which had a limited-term lease generating $550 in monthly rent or $6,600 per year, whereas Melvin was awarded all of the parties' businesses and all the assets of those businesses, which, according to the most recent year for which tax returns were available, grossed over $1.7 million.

¶ 36    As noted by the trial court, this court's more recent *Nord* decision is instructive. In *Nord*, this court upheld the ex-wife's permanent maintenance award of $17,000 per month based on a number of factors also present in the instant case, including the long duration of the parties' marriage, the parties' lifestyle during the marriage, and the fact the ex-wife was only employable at a minimum-wage job and the ex-husband had greater present and future potential to earn income and acquire assets. *Nord*, 402 Ill. App. 3d at 303-04, 932 N.E.2d at 556-57. Here, based on the record evidence, Melvin's income is more than sufficient to meet not only his own needs, but also Jill's needs. Jill should not be required to sell or impair the assets awarded to her in the divorce to continue the lifestyle she established during the parties' long marriage.

¶ 37                              B. Attorney Fees

¶ 38    Melvin next argues the trial court erred in ordering him to pay $15,000 toward Jill's attorney fees. Melvin asserts the court erred in ordering him to pay a portion of Jill's attorney fees because the financial circumstances of the parties is substantially similar due to the court's division of marital assets, liabilities, and Jill's maintenance award, and because Jill failed to show an inability to pay her own attorney fees. Jill argues the postdissolution financial circumstances of the parties are not substantially similar because Melvin was awarded all of the parties' businesses, which produced gross annual incomes in excess of $1.7 million. We agree with Jill.

¶ 39    Both parties cite authority which held a party seeking contribution to attorney fees must show an inability to pay and the other spouse's ability to pay. See *In re Marriage of Bussey*,

108 Ill. 2d 286, 299-300, 483 N.E.2d 1229, 1235 (1985); *In re Marriage of Hassiepen*, 269 Ill. App. 3d 559, 569, 646 N.E.2d 1348, 1356 (1995); *In re Marriage of Carr*, 221 Ill. App. 3d 609, 612, 582 N.E.2d 752, 754 (1991). However, this court has concluded a party seeking contribution to attorney fees under section 508(a) of the Dissolution Act must no longer show an inability to pay or the other spouse's ability to pay as no such requirement is contained in the statute. *In re Marriage of Haken*, 394 Ill. App. 3d 155, 163, 914 N.E.2d 739, 745 (2009). Rather, "[a]ny award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." 750 ILCS 5/503(j)(2) (West 2010). A trial court's decision to award attorney fees in a dissolution case will not be overturned absent an abuse of discretion. *Hassiepen*, 269 Ill. App. 3d at 569, 646 N.E.2d at 1356.

¶ 40    Melvin cites *In re Marriage of Passiales*, 144 Ill. App. 3d 629, 639, 494 N.E.2d 541, 549 (1986), and *In re Marriage of Moriarty*, 132 Ill. App. 3d 895, 900, 478 N.E.2d 537, 540 (1985), for the proposition where the financial circumstances of both parties are substantially similar, an award of attorney fees may be an abuse of discretion. However, the only facts Melvin cites to support his contention their financial circumstances are substantially similar postdissolution are the trial court (1) awarded Jill $1,156,117.90 in net marital assets and an equalization payment, and (2) ordered him to pay off the mortgages on two properties awarded to Jill.

¶ 41    Melvin fails to consider the trial court awarded him all of the parties' businesses which, for the most recent tax year provided, grossed over $1.7 million. We acknowledge a business's gross income does not equal net profit or net income; however, the trial court's decision to award Jill $15,000 in attorney fees was not based solely on what Melvin's businesses grossed. The trial court considered all of the financial issues affecting both parties as it should have under sections 503 and 504 of the Dissolution Act, including the distribution of their assets, their liabilities, and Jill's award of maintenance in ordering Melvin to pay a portion of Jill's attorney fees. At the time of the hearing on Jill's motion for contribution, Jill owed her attorney $78,837.40. Her total litigation expenses, including costs, totaled $115,374.05, of which Melvin paid $11,063 as a sanction for being held in contempt. On this evidence, the trial court determined in order to balance the equities between the parties, and because all the marital business had been awarded to Melvin, a $15,000 contribution to Jill's attorney fees award was necessary. Based on the record, the trial court did not abuse its discretion in ordering Melvin to pay $15,000 toward Jill's attorney fees.

¶ 42                              C. Equalization Payment

¶ 43    Last, Melvin argues the trial court erred in ordering him to make an equalization payment to Jill in the amount of $330,275.10 within 90 days of judgment. We disagree.

¶ 44    The goal of apportionment of marital property is to attain an equitable distribution. *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 979, 605 N.E.2d 670, 681 (1992). A trial court's distribution of marital property will not be disturbed absent an abuse of discretion. *In re Marriage of Drury*, 317 Ill. App. 3d 201, 210-11, 740 N.E.2d 365, 371 (2000).

¶ 45 Melvin cites *In re Marriage of Rosen*, 126 Ill. App. 3d 766, 778, 467 N.E.2d 962, 970 (1984), for the proposition equalization payments are not proper where a party will be required to sell or impair assets to make the ordered payment. He contends no evidence adduced at trial shows he possesses $330,275.10 in cash which would enable him to make the equalization payment. According to Melvin, the only possible source of such funds would require him to sell or impair assets–assuming a willing buyer or lender–awarded to him in the dissolution proceedings. Citing *In re Marriage of Leon*, 80 Ill. App. 3d 383, 387, 399 N.E.2d 1006, 1009 (1980), Melvin asserts the appropriate method for payment is installments rather than one lump sum.

¶ 46 First, we note while the *Rosen* Court did mention the $150,000 equalization payment the trial court ordered the ex-wife to pay the ex-husband, noting the ex-wife "will be required to sell or impair assets in order to make such payments, whereas [the ex-husband] possesses more than adequate liquidity to maintain and improve his standard of living for the foreseeable future," this was not the main reason for the court's reversal. *Rosen*, 126 Ill. App. 3d at 778, 467 N.E.2d at 970. The appellate court determined the trial court had improperly valued the ex-husband's trust by confusing "assets" and "income." *Id.* at 777, 467 N.E.2d at 969-70. This error significantly prejudiced the ex-wife because the value of nonmarital assets is an important factor in determining the appropriate disposition of marital property. *Id.* In other words, had the ex-husband's trust been valued appropriately, a $150,000 equalization payment may not have been necessary. Unlike in *Rosen*, no evidence in this case supports an argument the trial court improperly valued the parties' property in such a way the marital property may have been inappropriately awarded. Melvin fails to cite any additional authority–nor are we aware of any–to support his contention he should not be required to sell or impair his assets to make the equalization payment.

¶ 47 While installment payments may be appropriate in some cases, *Leon* does not require a trial court order equalization payments be made in installments. In *Leon*, the Second District Appellate Court opined the trial court could, in its discretion, allow the ex-husband to compensate the ex-wife in installment payments. *Leon*, 80 Ill. App. 3d at 387, 399 N.E.2d at 1009; see also *Rosen*, 126 Ill. App. 3d at 778, 467 N.E.2d at 970 (noting "where it has been necessary to award large assets to one spouse, the trial court is in a position to fashion offsetting payments flexibly"). In this case, after considering the total assets, liabilities, dissipation payments, and awards of nonmarital property, the trial court ordered Melvin to pay Jill $330,275.10 within 90 days. The trial court was in the best position to determine Melvin's ability to make this lump-sum payment and we find no abuse of discretion.

¶ 48                                    III. CONCLUSION

¶ 49 We affirm the trial court's judgment. We found the trial court's comprehensive written order very helpful. We find the trial court did not abuse its discretion in (1) awarding Jill $7,500 in monthly permanent maintenance; (2) ordering Melvin to pay $15,000 of Jill's attorney fees; and (3) awarding Jill a lump-sum equalization payment of $330,275.10.

¶ 50 Affirmed.