**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240493-U

Order filed August 26, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| GARY VICIAN, | ) | Du Page County, Illinois, |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-24-0493 |
| v. | ) | Circuit No. 02-D-2025 |
| | ) | |
| KATHLEEN VICIAN, | ) | |
| | ) | Honorable |
| Respondent-Appellee. | ) | Neal W. Cerne, |
| | ) | Judge, presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Justices Peterson and Anderson concurred in the judgment.

_____

**ORDER**

¶ 1        *Held*: We affirm the circuit court's order requiring respondent to pay petitioner $22,699.74 as his interest in her work-related retirement savings account.

¶ 2        Petitioner, Gary Vician, appeals from an order issued by the circuit court of Du Page County that required respondent, Kathleen Vician, to pay him the sum of $22,699.74 as his interest in her work-related retirement savings, following the parties' dissolution of marriage. For the following reasons, we affirm.

## I. BACKGROUND

### A. General Background

On December 23, 2003, the circuit court entered a judgment of dissolution of marriage that incorporated a marital settlement agreement executed by the parties on December 22, 2003. The agreement stated the following, in pertinent part:

"GARY and KATHLEEN each shall become sole and exclusive owner of FIFTY PERCENT (50%) of the marital portion of the value, rights, benefits and interest in each and every one of KATHLEEN'S work-related benefit plans as of the effective date of this Agreement. This division and distribution of the marital portion of the value, rights, benefits and interest in each such plan shall be pursuant to a Qualified Domestic Relations Order ("QDRO"); and, the entry of this QDRO shall be done in connection with this marital settlement agreement and the entry of a Judgment of Dissolution of Marriage (divorce decree) which incorporates this written marital settlement agreement."

As of the time of the execution of the agreement, Kathleen was employed by Elmhurst Memorial Hospital (Elmhurst) and was enrolled in the Elmhurst Memorial Hospital Pension Plan (Pension Plan). She also had a separate retirement savings account through Elmhurst (savings account).

On October 14, 2009, the court entered a qualified domestic relations order (QDRO) that assigned Gary 50% of the benefits that had accrued under the Pension Plan as of December 22, 2003. No QDRO was entered regarding Kathleen's savings account.

On September 21, 2022, Gary filed a petition in which he sought an accounting of "all monies" that had accrued in Kathleen's retirement accounts since the dissolution judgment, as well as entry of QDROs (petition). The court scheduled the petition for an evidentiary hearing.

### B. Evidentiary Hearing

¶ 9        Hearing on the petition occurred on July 1, 2024. Throughout the hearing, the court heard testimony from both parties, as well as from Edward John Graham, a certified public accountant.

¶ 10        Kathleen testified that she had both the Pension Plan and savings account at the time of the dissolution judgment. Sometime following the judgment, Kathleen ended her employment with Elmhurst and closed her savings account, which had a final balance of $14,120.95 and an outstanding $10,078.56 loan that she had made to herself to pay her attorney fees. Kathleen explained that she had initially believed that she was not required to divide the proceeds of her savings account with Gary because the account was in her name only, but later realized that she was mistaken. She had also mistakenly assumed that Gary had already received his interest in the savings account by the time that she had closed it.

¶ 11        Kathleen further testified that, at the time of the hearing, she was retired and receiving approximately $60,000 per year in income. She stated that her income comprised approximately $3,000 per month that she received from Gary's pension and approximately $1,956 that she received from social security. Kathleen also stated that she paid $4,300 per month toward personal loans, credit card loans, car payments, her mortgage, her gas and electric bills, and "other various loans," and that she had only $700 per month to pay for "[f]ood, gas, and anything else." She had also incurred $45,000 in attorney fees throughout the proceedings, of which $6,500 remained to be paid.

¶ 12        Gary testified that he was a certified chief financial officer for school districts, had formerly served as the chief financial officer of Naperville Township, and had earned a financial certification while obtaining his doctorate degree. Gary stated that, prior to the hearing, he had calculated his interest in Kathleen's savings account. He had calculated this amount by dividing the "original amount" in the savings account in half and then extrapolating to determine by how much his half

3

of the savings had "increase[d] or decrease[d] over the years." He also relied upon certain figures that Graham had generated and provided to him. Gary ultimately determined that the value of his interest in Kathleen's savings account was $34,974.94 at the time of the hearing. He also stated that his tax rate at all relevant times was 28%.

¶ 13     On cross-examination, Gary acknowledged that Graham had calculated the value of his interest in Kathleen's savings account to be less than $34,974.94. Gary explained that the amounts that he and Graham had calculated differed because Graham had relied upon the exact figures relating to the account's past performance whereas he had relied upon only estimates.

¶ 14     As to the effort that he had made to obtain his interest in Kathleen's savings account, Gary testified that he had "made requests over many years just to get the information, [but that he] was blocked." However, he acknowledged that "between 2003 when the divorce occurred, and 2009, [neither he nor his] attorney [took] any action to try to enter a qualified domestic relations order to separate [his] interests from Kathleen's interests." Gary explained that his attorney at the time had advised him to wait until Kathleen retired to separate his interest from hers. Gary further explained that, once the QDRO was entered, he had asked his attorney to send the QDRO to Elmhurst and thought that his attorney had done so, but that he "realize[d] *** there's more [he had] to do to check up on it ***." He also explained that he had not realized that he had to send the QDRO to Elmhurst and had assumed that Kathleen would do so instead.

¶ 15     Graham testified that he had been a certified public accountant since 2019 and that, as part of his work, he audited employee benefit plans. He stated that, prior to the hearing, he had reviewed Kathleen's savings account statements to assess the value of Gary's interest in the account at the time when the account had been closed in 2012. Graham explained that, in calculating Gary's interest, he had considered the account and loan balances listed in the statements, the personal rate

4

of return for each year that the account was open, and the way in which the assets of the account were allocated. Graham had ultimately determined that Gary's interest in Kathleen's savings account at the time of the hearing was $22,699.74 prior to taxes.

¶ 16 Graham also testified that he had reviewed the calculations made by Gary. Graham stated that Gary's calculations differed from his own in that Gary did not account for the same asset allocation as he had. Graham also did not know Gary's income tax bracket when he performed his own calculations.

¶ 17 C. Ruling and Notice of Appeal

¶ 18 On July 10, 2024, the court issued a written order that addressed Gary's petition. In the order, the court credited Graham's opinion that, at the time of the hearing, Gary's interest in Kathleen's savings account was $22,699.74 prior to taxes. The court found that the savings account was a 403(b) account, which, it noted, meant that Gary's interest had to be taxed upon withdrawal. Based on the fact that Gary had testified that his tax rate was 28%, the court found that his interest in the savings account was $16,343.81 after taxes. The court awarded him this amount by way of a QDRO and ordered Kathleen to pay him $50 per month until his interest was paid in full.

¶ 19 On August 8, 2024, Gary filed a notice of appeal.

¶ 20 II. ANALYSIS

¶ 21 First, Gary argues on appeal that the court incorrectly found that the value of his interest in Kathleen's savings account was $22,699.74. Gary argues that this finding was erroneous because it was based on Graham's calculations, which, he contends, were flawed. Gary argues that the court should have discredited Graham's calculations and instead based its award on his own calculations, which had led him to determine that his interest in Kathleen's savings account was $34,974.94.

¶ 22    It is axiomatic that, when the circuit court holds an evidentiary hearing, we review whether the court's factual findings were against the manifest weight of the evidence. See, *e.g.*, *Lukanty v. Moglinicki*, 2022 IL App (1st) 210794, ¶ 27; *GreenPoint Mortgage Funding, Inc. v. Hirt*, 2020 IL App (1st) 190832, ¶ 44. A finding is against the manifest weight of the evidence when the opposite conclusion is clearly apparent or when the finding itself is arbitrary, unreasonable, or not based on the evidence. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Because the circuit court is in the best position to observe the conduct and demeanor of the witnesses, a reviewing court will not substitute its judgment for that of the circuit court regarding the credibility of the witnesses, the weight to be given to the evidence, or the inferences to be drawn. *Id* at 350-51.

¶ 23    To find in this case that the circuit court should have credited Gary's calculations over Graham's regarding the value of Gary's interest in Kathleen's savings account would require us to reweigh the available evidence, which we must not do. Additionally, although Gary testified that he had calculated his interest to be $34,974.94 at the time of the hearing, he also stated that his calculations were based on estimated, rather than exact, figures relating to the past performance of the savings account. In contrast, Graham testified that he had based his own calculations on the information contained in various statements relating to the savings account, which included the account balances, the annual personal rates of return, and the way in which the account assets were allocated. Graham also detailed the individual steps that he took to calculate Gary's interest and answered the court's clarifying questions. Based on this testimony, it was not against the manifest weight of the evidence for the court to find that the value of Gary's interest in the savings account was $22,699.74 at the time of the evidentiary hearing.

¶ 24    Second, Gary argues that the court erred by ordering Kathleen to pay him his share of her savings account in installments of $50 per month. According to Gary, "[s]uch a payment amount

6

is preposterous," partly because he "is presently 70 years old" and, under the installments ordered by the court, the full amount owed to him "would not be satisfied for 327 months, or 27 years," at which time he would be 97 years old. Pointing out that he "is paying [Kathleen] $3,000.00 a month from his retirement account," Gary contends that the court should have instead reduced his own monthly payments to Kathleen by an amount that would, within five years, add up to his interest in her savings account owed to him.

¶ 25   On review, "[a] trial court's distribution of marital property will not be disturbed absent an abuse of discretion." *In re Marriage of Price*, 2013 IL App (4th) 120155, ¶ 44. "An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal citation omitted). *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.

¶ 26   During the hearing, Kathleen testified that she was retired and that her annual income was $60,000, which comprised approximately $3,000 per month that she received from Gary's pension and approximately $1,956 that she received from social security. As to her expenses, Kathleen testified that she spent approximately $4,300 per month on loan repayment and gas and electric bills and typically only had approximately $700 per month remaining from her income to pay for "[f]ood, gas, and anything else." Kathleen also testified that she had incurred $45,000 in attorney fees throughout the proceedings and still had $6,500 in fees that remained to be paid. Based on this testimony, it was not unreasonable for the court to decline to further reduce Kathleen's income by lowering the monthly amount that Gary was required to pay her from his pension. Nor was it unreasonable, or an abuse of discretion, for the court to order Kathleen to pay Gary his interest in her savings account in monthly installments of $50.

¶ 27                                    III. CONCLUSION

7

¶ 28        The judgment of the circuit court of Du Page County is affirmed.

¶ 29        Affirmed.