NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190499-U

NO. 4-19-0499

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 23, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| CHAITANYA ARE, | ) | Circuit Court of |
|     Petitioner-Appellee and | ) | Champaign County |
|     Cross-Appellant, | ) | No. 15D568 |
|     and | ) | |
| RAJARAJESWARI SWARNA, | ) | Honorable |
|     Respondent-Appellant and | ) | Roger B. Webber, |
|     Cross-Appellee. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court did not abuse its discretion by ordering a $46,368 offset from respondent's allocation of marital assets for child support purposes.

(2) The trial court did not abuse its discretion in the manner in which it allocated the parties' marital assets.

(3) The trial court did not abuse its discretion in awarding maintenance to respondent but did err by (i) imputing minimum wage income to respondent when determining the amount of maintenance to award and (ii) ordering maintenance payable in a lump sum instead of in periodic payments.

¶ 2    In December 2017, the marriage of petitioner, Chaitanya Are, and respondent, Rajarajeswari Swarna, was dissolved. In June 2019, the trial court entered a judgment order, resolving remaining financial issues in the case, including child support, maintenance, and the distribution of marital property. Respondent appeals, arguing the court erred by (1) ordering a

$46,368 offset from her allocation of marital assets for child support purposes, (2) awarding 70% of the parties' marital assets to petitioner and only 30% to her, and (3) ordering maintenance in an insufficient amount and for an insufficient duration. Petitioner cross-appeals, arguing the court erred by (1) awarding any maintenance to respondent and (2) ordering him to pay maintenance in a lump sum rather than by periodic payments. We modify the amount and form of the trial court's maintenance award but otherwise affirm the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4        In August 2009, the parties were married in India, where both had obtained medical degrees and were qualified to practice medicine. At the time of the marriage, petitioner was living in Illinois and employed as a medical resident with the University of Illinois. After the marriage, respondent came to the United States and began the process of becoming licensed to practice medicine in this country. In January 2012, the parties' only child, P.A., was born in the United States.

¶ 5        In December 2015, petitioner filed a petition for dissolution of marriage. In 2017, he also sought, and was granted, an order of protection against respondent on behalf of himself and P.A. The order of protection was based on allegations that respondent had sexually abused P.A. in March 2017. In December 2017, the trial court entered an order dissolving the parties' marriage. Its judgment incorporated a final parenting plan submitted by petitioner, which allocated all parenting responsibilities and parenting time concerning the parties' child to him. Consistent with the terms of the order of protection, respondent was denied any parenting time. The court reserved financial issues in the case for further hearing.

¶ 6        In January 2018, respondent was arrested and charged with predatory criminal

sexual assault of a child and aggravated criminal sexual abuse based on the same allegations underlying the order of protection entered against her. After her arrest, respondent was continuously held in custody. The record reflects she was twice declared unfit to stand trial during those criminal proceedings and placed with the Department of Human Services (DHS) for treatment.

¶ 7        In July 2018, petitioner filed a "PETITION FOR LEAVE TO RELOCATE WITHOUT NOTICE." Specifically, he asked the trial court to allow him to relocate outside of Illinois with P.A. without disclosing his intended location to respondent. In October 2018, the court allowed the petition.

¶ 8        In January 2019, the trial court conducted a hearing on the remaining financial issues in the case and both parties testified at the hearing. Petitioner testified he was 38 years old and worked as a doctor. In 2003, he graduated from medical school in India. After his graduation and until 2006, he worked in a post-graduate training position in the United Kingdom. Petitioner stated he was essentially working as a doctor "but supervised." In 2007, he joined a residency program at the University of Illinois in Urbana-Champaign. He testified he came to the United States on an H-1B visa, which allowed him to be employed.

¶ 9        Petitioner explained that before joining the University of Illinois's residency program, he had to take the United States Medical Licensing Exam, which has three steps. After completing the first and second steps, a person can become certified by the Education Consul for Foreign Medical Graduates (ECFMG). An ECFMG certification allows graduates from foreign medical schools to participate in medical training programs in the United States. Petitioner testified he completed all three steps in the medical licensing exam before he began working at the

University of Illinois as a medical resident.

¶ 10　　　　Petitioner testified he worked at the University of Illinois from 2007 to 2011. In August 2009, he married respondent in India, and she moved to the United States as petitioner's "dependent on an H-4 visa." Petitioner agreed that the parties had an arranged marriage but denied that he received any money from respondent's parents either at the time the parties married or during the marriage. Petitioner also denied that the parties had an agreement regarding "who was going to work and who was going to stay home." He stated at the time of the marriage, respondent had graduated from medical school and was studying for the medical licensing exam. His expectation was that respondent would practice medicine after moving to the United States and taking her exams. In 2010, respondent passed step one of the medical licensing exam.

¶ 11　　　　In July 2011, petitioner obtained employment at the University of Iowa in its department of internal medicine and the parties moved to Iowa. Petitioner testified he initially held the position of clinical associate and was later promoted to clinical assistant professor. His job duties involved taking care of patients, supervising medical residents, and teaching. Petitioner's initial contract with the University of Iowa was for compensation of $165,000 per year. When he was promoted, his pay increased to approximately $185,000 per year. However, petitioner testified he had the opportunity to earn more income by taking extra shifts.

¶ 12　　　　While the parties lived in Iowa, P.A. was born. Respondent also continued to study for the medical licensing exam and, by 2013, passed step two of that exam. According to petitioner, respondent additionally held "a couple of voluntary positions" in which she shadowed other doctors or participated in research work.

¶ 13　　　　In January 2014, the parties sent P.A. to live with petitioner's mother in India,

where P.A. remained until April 2015. According to petitioner, respondent wanted more time to study and the parties decided that it was better for P.A. to be cared for by petitioner's mother rather than to be in daycare. Petitioner testified that when P.A. returned to their care, the parties initially split childcare duties "pretty evenly." He testified that respondent would take P.A. to daycare in the morning and he would pick P.A. up in the evening around 5:30 p.m. He asserted that he took care of P.A. in the evenings while respondent was studying.

¶ 14 In June 2015, petitioner obtained employment at Carle Foundation Hospital (Carle) in Champaign and the parties returned to Illinois. Petitioner worked as a hospitalist, meaning he took care of adult patients who were admitted to the hospital. His base income when he began at Carle was $270,000.

¶ 15 Petitioner testified that when the parties moved back to Illinois, respondent "was still preparing for her exams." In July 2015, she also began a voluntary and unpaid research position at the University of Kansas. That position required respondent to live three weeks each month in Kansas. Petitioner asserted that while respondent was away, he cared for P.A. He stated the parties employed a nanny who got P.A. ready in the mornings and took her to daycare. The nanny also picked P.A. up from daycare and cared for her until petitioner came home from work. According to petitioner, when respondent returned to Illinois from Kansas, she cared for P.A. "on and off." Petitioner estimated that respondent held her research position with the University of Kansas until approximately February 2016.

¶ 16 In December 2015, petitioner filed for divorce. At the time, the parties were living in a rental house. After the divorce filing, the parties moved into separate apartments paid for by petitioner. Petitioner testified he further provided respondent money for living expenses after their

separation, stating he gave $64,503.50 to respondent between January 2016 and May 2017.

¶ 17       Around April 2016, respondent expressed to petitioner that she wanted to pursue graduate courses in either public health or bioinformatics and that "she wanted to prepare for the Toefl and the GRE exams," which were prerequisite exams for acceptance into a university master's program. Respondent asked petitioner for $10,000, which she needed both for preparatory courses for the exams and the exams themselves. Petitioner testified he was supportive of respondent's idea to continue her education and gave her $10,000. He noted that respondent was still in the United States on a dependent visa that would become "null" after the parties' divorce. Petitioner believed pursuing a master's degree would give respondent both a student visa so that she could legally remain in the country and the opportunity to work and earn income. However, to petitioner's knowledge, respondent never took either prerequisite exam.

¶ 18       Petitioner acknowledged that in 2009, respondent's dependent visa status did not allow her to work or earn income in the United States. However, he asserted that in 2015, immigration laws changed such that dependents were permitted to work after submitting an Employment Authorization Document (EAD) and obtaining approval from immigration authorities. According to petitioner, respondent never submitted an EAD form.

¶ 19       Petitioner further recalled that respondent applied for medical residency programs in the United States in 2013, 2014, and 2015. In 2014, her application for a program was considered and she was called for an in-person interview. Respondent also reported to petitioner that she applied for a residency program in 2016. Ultimately, however, respondent was never accepted into a program. Petitioner believed that while applying for residency programs, respondent was continuing to study for step three of the medical licensing exam. To his knowledge, respondent

- 6 -

never took step three of the exam.

¶ 20 Petitioner testified that, in India, medical school graduates are required to participate in a one-year compulsory internship to earn their medical degree. At the end of the internship, the graduate must register with the licensing board and can start working as a general practitioner. To petitioner's knowledge, respondent completed all the necessary steps to practice medicine in India.

¶ 21 Petitioner also testified that after the parties' separation, P.A. "spen[t] most of her time with [him]." On average, she was with petitioner 18 days a month. Petitioner testified the parties alternated weekends and respondent cared for P.A. three days a week. P.A. also attended daycare. According to petitioner, that parenting arrangement lasted until March 2017, when he received "a really alarming text message" that indicated respondent was "being inappropriate with" P.A. The text message prompted him to contact the police and "child protection services," and to seek an order of protection against respondent. Petitioner testified that P.A. had been solely in his care since March 2017 and had no contact with respondent.

¶ 22 In December 2018, petitioner submitted a financial affidavit in the case, which he testified accurately set forth his monthly living expenses and income. In his affidavit, petitioner reported earning gross income of $322,550 in 2017. As of December 5, 2018, his gross income for 2018 totaled $305,000. Petitioner asserted his current gross monthly income was $25,753.56. After monthly deductions of $13,184.26, he reported net monthly income of $12,569.30. Petitioner further represented that he had monthly living expenses of $11,880.

¶ 23 Petitioner explained his current monthly expenses as they related to P.A. He asserted those expenses included $1200 per month for P.A.'s private school tuition; $250 per

month for extracurricular activities, including dance, martial arts, and piano; $1200 per month for childcare; and $50 per month for P.A.'s counseling and therapy. Petitioner stated he enrolled P.A. in counseling in 2016 to help her cope with the parties' divorce. After the March 2017 incident, there was a period of time when P.A. visited her counselor more frequently. Petitioner further testified that he provided P.A.'s health, dental, and vision insurance through his employer. He paid $395 per month for insurance for both himself and P.A.

¶ 24    Petitioner testified his monthly expenses also included $100 per month for his own therapy and counseling and an average monthly vehicle payment of $600. Petitioner stated he drove a 2017 Subaru Outback that was purchased in May 2017, prior to the parties' divorce. At the time of trial, petitioner's vehicle had a fair market value of $25,000 and a loan balance of $17,000. Additionally, he acknowledged that during the parties' marriage, he made voluntary contributions to retirement accounts of around $1700 a month. After the parties divorced, his voluntary contributions increased to over $3000 a month.

¶ 25    According to petitioner, the parties had credit card debt of approximately $11,400 at the time of dissolution and during the marriage it was common for them to "carryover from month to month" a large credit card balance. He testified that at the time of the hearing, he had no credit card debt and was able to pay off his credit card balance each month. The record reflects petitioner prepared an inventory of marital assets that was entered into evidence and stipulated to by respondent. The inventory listed marital assets that included two vehicles and numerous bank, retirement, and investment accounts. The parties agreed they had marital assets totaling $364,356.

¶ 26    Petitioner further agreed that the parties had a comfortable lifestyle during the marriage. He acknowledged that P.A. attended the most expensive private school in Champaign-

Urbana and that they previously paid daycare expenses of $1600 a month on top of private school tuition payments. Petitioner testified the parties were able to afford vacations, traveled to India, and paid for petitioner's parents to fly from India to the United States. Additionally, he donated $850 a month to charity and sent money to his mother and a friend in India.

¶ 27 With respect to respondent's mental health, petitioner acknowledged that in 2018, he sought approval from the trial court to relocate outside of Illinois with P.A. and that in his filings, he alleged respondent had a "serious mental illness." He testified he was aware that respondent had a "serious mental illness" because in 2017, she called his work claiming that he was deceased. Petitioner testified that to the best of his knowledge, people with mental illness could still practice medicine. Whether someone with a mental illness could become a licensed physician depended on the person's diagnosis and symptoms.

¶ 28 The record reflects respondent was 36 years old at the time of the hearing and incarcerated in the Champaign County Jail on pending criminal charges. Respondent testified she had been in jail for approximately a year but had also spent a period of five months in a mental health facility in southern Illinois. Respondent asserted she was currently on medication. She also testified that she had a brother who lived in the United States. In December 2017, she signed an affidavit giving her brother power of attorney over her finances. She acknowledged that she understood the documents that gave her brother power of attorney when she signed them.

¶ 29 Respondent further testified that she was unable to work, stating she could not "practice here" because she did not get into a residency program. She stated she had not taken the third step of the medical licensing exam and that she had low scores on the other parts of the exam. Respondent explained that her scores were low because she did not have time to study and, instead,

"took care of [her] home and [her] kid." While in jail, respondent earned no money. She did not believe she would be able to "become a doctor" if she were released because it had been 10 years since she graduated from medical school. Respondent also had no future plans for earning income, asserting she could not work because she was diabetic.

¶ 30    Respondent testified it was her belief that her only illness was being diabetic and "feeling tired." Her diabetes was controlled with medication. Respondent also asserted that after petitioner filed for divorce, she started "not feeling well," which caused problems with her ability to focus and her ability to obtain her medical license. She testified that she could not perform the same type of volunteer work that she previously performed in Kansas because she was "incapable," did not "have enough energy," and was "not interested." She agreed that it was "difficult for [her] brain to figure [those] things out now" but also testified that there was "no use of doing it now" because she was years from her graduation and had "less chance of getting into residency."

¶ 31    Respondent maintained that after the parties married in 2009, she came to the United States to follow petitioner and his career. She stated that the parties' marriage was arranged and that her family gave petitioner's family $20,000. Respondent asserted her family also sent petitioner approximately $20,000 after the marriage, which she used for household expenses. Respondent testified that during the marriage, she prepared meals for the family and took care of P.A.

¶ 32    Respondent acknowledged that she graduated from medical school in India in 2009, which included an internship. In 2009, she had the ability to practice medicine in India. After coming to the United States, she passed the first two parts of the medical licensing exam. Between 2014 and 2018, she was studying for the third part of the exam. Respondent testified that although

petitioner gave her money to take the prerequisite exams for a master's program, she did not take the exams because she was taking care of the parties' child, was depressed, and did not have time to study. Respondent agreed that she could have obtained a student visa if she attended graduate school and that she would legally be allowed to practice medicine if she returned to India. However, respondent testified that to get a job as a doctor in India she would "have to study more." Respondent testified that if she were released from jail she would be deported to India.

¶ 33     At the conclusion of the evidence, petitioner asked the trial court to deny respondent maintenance, order respondent to pay him child support in a lump sum either from her share of the marital estate or deducted from any amounts he was ordered to pay in maintenance, and order a "70/30 split" of marital assets in his favor. Respondent, citing mental health issues that prevented her from working, asked the court to award her maintenance and to deviate from statutory guidelines by ordering a lengthier term of maintenance than required by statute. She further requested that she not be ordered to pay child support given her inability to work and that the court enter an unequal division of marital assets in her favor.

¶ 34     The trial court took the matter under advisement. In June 2019, the court entered its written order, setting forth its finding as to the remaining issues in the case. With respect to child support, the court first found that "[a] zero dollar [child support] order" was appropriate because respondent was unable to work due to incarceration or institutionalization. In particular, it noted that respondent was arrested in January 2018 and, thereafter, held in jail or a secure mental health facility. Nevertheless, the court determined that "[t]he interests of equity" required it to establish some sort of child support obligation for respondent through an offset of either maintenance or distribution of assets. The trial court noted petitioner submitted maintenance and

- 11 -

child support calculations that imputed minimum wage income to respondent and resulted in a lump sum award of $46,368, which it found appropriate. It ordered that amount offset from respondent's allocation of marital assets.

¶ 35          With respect to maintenance, the trial court used the same calculations submitted by petitioner, imputing minimum wage income to respondent, and the statutory guidelines to arrive at a maintenance obligation of $5436 a month for a period of 21 months. The court found that amount yielded a total maintenance obligation of $114,156, which it ordered petitioner to pay in a lump sum given the pending criminal charges against respondent, respondent's visa status, the order of protection, petitioner's relocation, and the disparity in financial opportunities between the parties.

¶ 36          Finally, the trial court agreed with petitioner that a "70/30 split" of marital assets in his favor was appropriate. It found that the parties' marital assets at the time of dissolution in December 2017, totaled $364,356. From that amount it subtracted a college savings plan totaling $18,516, ordering that it be assigned to petitioner for P.A.'s benefit. Under the court's division, respondent received $103,752 of the remaining assets and petitioner received $242,088. The court noted that after subtracting the $46,368 lump sum child support award from respondent's allocation and awarding her two bank accounts in her name, its division of marital assets required that respondent receive only an additional $40,481 in marital assets. The court ordered petitioner to pay that amount to respondent in cash or through the assignment of marital assets.

¶ 37          These appeals followed.

¶ 38          II. ANALYSIS

¶ 39          A. Offset for Child Support

¶ 40　　　　　On appeal, respondent first argues the trial court erred by offsetting $46,368 from her allocation of the marital assets for the purpose of child support. She contends the court's decision was an abuse of discretion given petitioner's greater financial resources and her lack of income. Respondent also asserts that the court's own findings contradict its ruling and that it erred by imputing income to her without first finding that she was voluntarily unemployed, attempting to evade support, or failing to take advantage of an employment opportunity.

¶ 41　　　　　Section 505 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/505 (West 2018)) governs a trial court's award of child support. That section provides that a trial court determines a parent's child support obligation by first determining each parent's net income. *Id.* § 505(a)(1). The Act sets forth a rebuttable presumption that a minimum child support obligation of $40 per month, per child, should be entered for any obligor whose actual or imputed gross income is "at or less than 75% of" recent poverty guidelines for a family of one person. *Id.* § 505(a)(3.3a). Further, it provides that "[f]or parents with no gross income, *** who cannot work due to a medically proven disability, incarceration, or institutionalization, there is a rebuttable presumption that the $40 per month minimum support order is inapplicable and a zero dollar order shall be entered." *Id.* § 505(a)(3.3b).

¶ 42　　　　　The issue of child support is also addressed in section 503 of the Act, which governs the trial court's disposition of marital property. *Id.* § 503. Under that section, the trial court is required to "divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including *** the custodial provisions for any children[.]" *Id.* § 503(d)(9); see also *In re Marriage of Stone*, 155 Ill. App. 3d 62, 75, 507 N.E.2d 900, 908 (1987) (stating that "[t]he Act provides that marital property shall be divided in 'just proportions'

- 13 -

considering all relevant factors" and "[w]here children are involved, the primary objective of the court is to provide adequate support for the children"). The court has authority to "make such judgments affecting the marital property as may be just." 750 ILCS 5/503(i) (West 2018). That section further provides as follows:

"The court if necessary to protect and promote the best interests of the children may set aside a portion of the jointly or separately held estates of the parties in a separate fund or trust for the support, maintenance, education, physical and mental health, and general welfare of any minor, dependent, or incompetent child of the parties. In making a determination under this subsection, the court may consider, among other things, the conviction of a party of [certain specified criminal offenses, including predatory criminal sexual assault (720 ILCS 5/11-1.40 (West 2018)), and aggravated criminal sexual abuse (720 ILCS 5/11-1.60 (West 2018))] if the victim is a child of one or both of the parties, and there is a need for, and cost of, care, healing and counseling for the child who is the victim of the crime." *Id.* § 503(g).

¶ 43      In this case, the trial court entered an 11-page order that separately addressed the issues of child support, maintenance, and property division. When initially addressing the issue of child support under section 505, the court determined that a "zero dollar order" was appropriate under section 505(a)(3.3b) due to respondent's "institutionalization." However, the court made additional findings with respect to the issue of child support when addressing the division of marital property under section 503. Specifically, the court stated as follows:

"The court has *** entered a 'zero dollar' child support award at this time because of [r]espondent's inability to work due to her institutionalization. However,

- 14 -

that does not mean that she should be completely relieved of any obligation to support her child. The interests of equity require the court to establish some sort of child support obligation even if the only likelihood of any contribution in that regard is to offset either a maintenance award or distribution of assets.

\* \* \*

Based upon the [r]espondent's situation (both with respect to the pending criminal case and her [v]isa status) it is unlikely that she will ever pay child support in any meaningful amounts or with any degree of regularity."

Accordingly, the court utilized calculations submitted by petitioner to find that respondent's award of marital assets should be reduced by $46,368 "to offset her calculated child support obligation."

¶ 44        Here, we find the trial court's decision to order an offset from the marital assets it awarded to respondent for child support purposes was authorized by the Act and not contrary to its initial "zero dollar order." Under section 505 of the Act, an award of child support is based on the income of the parties; however, section 503 of the Act contemplates that the court may utilize marital or nonmarital assets for support purposes. Here, the court's order reflects a finding that while respondent currently lacked income sufficient to support an award under section 505 of the Act, she did have assets from which support could be provided as anticipated by section 503 of the Act.

¶ 45        Additionally, as noted by petitioner, this court's decision in *In re Marriage of Hari*, 345 Ill. App. 3d 1116, 804 N.E.2d 144 (2004), also supports the trial court's action. In that case, the trial court refused to order a father who was serving an aggregate 73-year prison term to pay child support, believing there was "nothing" it could do absent a reversal of the father's

convictions. *Id.* at 1118-119. On review, we reversed, holding that "[i]ncarceration of the noncustodial parent does not automatically relieve that parent of the obligation to support his child." *Id.* at 1120; see also *Meyer v. Nein*, 209 Ill. App. 3d 1087, 1089, 568 N.E.2d 436, 437 (1991) (holding "incarceration, as a foreseeable result of criminal activity, does not *ipso facto* relieve one of the obligation to pay child support"). We found a court has discretion to order the imprisoned parent to pay child support, stating as follows:

> "In exercising its discretion, the court should consider all relevant factors, including the following: (1) the assets of the incarcerated parent; (2) the reason the parent entered prison; (3) the length of incarceration; and (4) the potential for work release. [Citation.] In addition, *** the trial court's discretion generally should be guided by the principle that child support obligations should not be suspended or terminated if the incarcerated, noncustodial parent has available assets." *Hari*, 345 Ill. App. 3d at 1120.

We held that section 503(g) of the Act "explicitly allows the trial court to set aside in a separate fund a portion of the noncustodial parent's nonmarital or marital assets to assure payment of his child support obligation if that parent is either unwilling or unable to make child support payments." *Id.* at 1122.

¶ 46     Thus, both section 503 of the Act and this court's prior case authority permit a trial court to consider a parent's marital assets when addressing the issue of child support. In this case, although respondent was incarcerated, could not work, and had no income, she was able to provide support to the parties' child through her portion of the marital assets. Additionally, although, as respondent argues, petitioner did earn a substantial income, that factor alone does not necessarily

- 16 -

relieve respondent of her obligation of support. Evidence showed P.A. was almost seven years old at the time of trial. Petitioner was her sole source of support both then and for the foreseeable future. As the court recognized, respondent's circumstances were such that she would likely never be able to pay child support to petitioner. This was true even in the event her criminal case resolved and her ability to become employed changed. Given that modification of a "zero dollar order" would be unlikely in the future, the court elected to order an offset from respondent's allocation of marital assets. Under the circumstances presented, we find no abuse of discretion by the court.

¶ 47      We also disagree with respondent's assertion that the trial court erred in imputing income to her when calculating the amount of the offset. To support her argument, respondent cites *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1077, 916 N.E.2d 614, 618 (2009), for the proposition that a court may not impute income to a noncustodial parent unless it finds the parent is voluntarily unemployed, attempting to evade a support obligation, or has unreasonably failed to take advantage of an employment opportunity. However, we find *Gosney* distinguishable in that it involved the trial court's attempt to determine the net income of a parent under section 505(a)(1) of the Act. That case does not control the circumstances presented here, where a parent has no present income due to incarceration but does have available assets from which a child support obligation may otherwise be satisfied.

¶ 48      Further, in circumstances such as those presented here, the trial court must necessarily utilize some criteria for determining the appropriate amount of assets to be set aside or offset from the payor parent's assets. In *Hari*, 345 Ill. App. 3d at 1121, we looked to a previous temporary child support order to determine the "appropriate amount" of child support for the payor spouse. In this case, there was no similar prior order. Instead, the record shows petitioner submitted

calculations to the court, which imputed income to respondent "at minimum wage for 40 hours per week." The court determined those calculations resulted in a lump sum figure that was "an appropriate amount to use" for determining the amount to offset from respondent's award of marital assets. Given the circumstances presented, including respondent's education and training, pending criminal charges, mental health issues, and likely deportation, the amount selected was not unreasonable and we find no abuse of discretion.

¶ 49                                    B. Division of Property

¶ 50            On appeal, respondent next argues that the trial court abused its discretion by awarding 70% of the parties' marital assets to petitioner and only 30% to her. She contends the court's allocation was an abuse of discretion because petitioner earned a substantial income and had a greater earning capacity, while she was not permitted to work in the United States, faced deportation to India, and suffered from mental health issues that affected her future employability.

¶ 51            As stated, section 503 of the Act (750 ILCS 5/503 (West 2018)) governs the trial court's disposition of marital property, and under that section, the court "shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors[.]" *Id.* § 503(d). Relevant factors for consideration include the following:

>           "(1) each party's contribution to the acquisition, preservation, or increase or
>
>           decrease in value of the marital or non-marital property, including *** the
>
>           contribution of a spouse as a homemaker or to the family unit ***;
>
>           (2) the dissipation by each party of the marital property[;] ***
>
>           (3) the value of the property assigned to each spouse;
>
>           (4) the duration of the marriage;

(5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having the primary residence of the children;

(6) any obligations and rights arising from a prior marriage of either party;

(7) any prenuptial or postnuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." *Id.*

¶ 52　　　　"The goal of apportionment of marital property is to attain an equitable distribution" (*In re Marriage of Price*, 2013 IL App (4th) 120155, ¶ 44, 986 N.E.2d 236) and the trial court has authority to "make such judgments affecting the marital property as may be just" (750 ILCS 5/503(i) (West 2018)). Ultimately, "[a] trial court's distribution of marital property will not be disturbed absent an abuse of discretion." *Price*, 2013 IL App (4th) 120155, ¶ 44. "In determining whether the trial court abused its discretion in dividing marital property, this court will not substitute its judgment for that of the trial court unless no reasonable person would adopt the position of the trial court." *In re Marriage of Oden*, 394 Ill. App. 3d 392, 397, 917 N.E.2d 13,

- 19 -

¶ 53    Here, the trial court found an unequal division of marital property in petitioner's favor was the most equitable resolution. In setting forth its decision, the trial court explicitly referenced each statutory factor. It identified factors weighing in favor of a disproportionate award to respondent as those addressing the income of the parties, their employability, and their future opportunities for the acquisition of assets and income. The court also noted respondent's pending criminal charges, that she had been declared unfit in her criminal case and was receiving treatment, and her likely deportation to India. Conversely, it determined the factors weighing in favor of a disproportionate award of assets to petitioner included his financial contributions during the marriage and support of respondent while she sought to become a licensed physician in the United States, as well as his sole custody and support of the parties' minor child. In reaching its ultimate conclusion, the court identified those factors to which it gave the most weight, stating as follows:

> "Considering all the statutory factors in section 503, but particularly each party's contribution to the accumulation or preservation of wealth and that this award is in addition to rather than in lieu of maintenance, the court believes that a 70 / 30 split of [the marital] assets in favor of [p]etitioner is appropriate."

¶ 54    The trial court's order shows that it properly considered relevant factors in the case, including those emphasized by respondent on appeal regarding her lack of income, her future income earning prospects, her risk of deportation, and her mental health. In the end, however, the court, as it was entitled to do, gave more weight to the fact that petitioner was the "sole source of income during the marriage," his support of respondent while she pursued career opportunities in this country, and the fact that it was ordering a separate award of maintenance to be paid by

petitioner to respondent.

¶ 55    Additionally, we note that the evidence presented does not support respondent's suggestion on appeal that she had only "zero dollar earning potential." Undoubtedly, the evidence presented established respondent's inability to work and earn income both at the time of the hearing on financial issues and in the near future. Nevertheless, the outcome of her pending criminal case was uncertain, and while she likely faced deportation to India, no evidence was presented that she would be indefinitely unemployable. Prior to the instant dissolution proceedings, respondent graduated from medical school in India and became legally authorized to practice medicine there. She also studied to become certified to practice medicine in this country and passed two steps of the three-step medical licensing exam. Further, although the record indicates respondent was suffering from mental health issues, little evidence was presented regarding those issues. Significantly, respondent presented no evidence of a specific diagnosis or condition from which she suffered. She also presented no evidence that her mental health issues were untreatable. There was simply no evidence presented at the underlying hearing that would support a finding that respondent was completely foreclosed from any and all types of employment such that she lacked any future earning potential.

¶ 56    Here, the record shows the trial court considered relevant statutory factors and made factual findings that were supported by the record. We find no abuse of discretion by the trial court in the weight it accorded to the relevant factors or in its ultimate allocation of martial assets to each party.

¶ 57                    C. Maintenance

¶ 58    On appeal, both parties challenge the trial court's lump sum maintenance award.

Respondent argues she was entitled to a greater amount of maintenance for a longer duration. On cross-appeal, petitioner argues the court erred by awarding respondent any maintenance or, alternatively, that the court erred by awarding maintenance in a lump sum rather than by periodic payments.

¶ 59                    1. *Propriety of the Trial Court's Maintenance Award*

¶ 60         Initially, we address petitioner's contention that the trial court erred in awarding *any* maintenance to respondent. He argues the court abused its discretion in awarding maintenance because the evidence presented showed respondent was trained, healthy, and employable, and because none of her efforts during the marriage contributed to his wealth or earning potential. Petitioner also asserts that respondent should receive no maintenance because all of her difficulties, financial and otherwise, were self-created.

¶ 61         Section 504 of the Act governs the trial court's award of maintenance. 750 ILCS 5/504 (West 2018). It provides that the trial court "may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just, without regard to marital misconduct[.]" *Id.* § 504(a). Maintenance may be payable from either income or property. *Id.* The first step for the trial court when addressing the issue of maintenance is to "make a finding as to whether a maintenance award is appropriate, after consideration of all relevant factors[.]" 750 ILCS 5/504(a) (West Supp. 2019). Relevant factors for consideration include the following:

> "(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

- 22 -

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the

education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable."

*Id.*

¶ 62        "[T]he propriety of a maintenance award is within the discretion of the trial court and the court's decision will not be disturbed absent an abuse of discretion." *In re Marriage of Schneider*, 214 Ill. 2d 152, 173, 824 N.E.2d 177, 189 (2005). "A trial court abuses its discretion only where no reasonable person would take the view adopted by the trial court." *Id.*

¶ 63        Here, in finding a maintenance award in respondent's favor was appropriate, the trial court, again, made explicit findings as to each factor set forth in the relevant portion of the Act. The evidence relied upon by the court showed petitioner was "well employed as a medical doctor earning a significant income." The record contains no evidence of any impairment to his future earning capacity. Further, as discussed above, the court awarded the larger share of the parties' marital assets to petitioner based in large part upon his financial contributions during the marriage.

¶ 64        Respondent, on the other hand, was incarcerated and facing serious criminal charges and likely deportation. She had no source of income at the time of the underlying hearing and was not employable both due to her incarceration and her dependent visa status. In fact, although respondent had been qualified to work as a doctor in India prior to the marriage, her visa status precluded her from obtaining any employment in this country during most of the marriage. Additionally, as determined by the court, whether respondent was acquitted of the criminal charges against her or convicted and sentenced to a term of imprisonment, she would ultimately require

"some time to get reacclimated to society and either complete her medical training or find other employment." The evidence also supports a finding that respondent would "be in no position to replicate the standard of living established during the marriage for some period of time after" her criminal case was resolved.

¶ 65    Further, while petitioner argues on appeal that respondent was "healthy," the record does indicate that she was suffering from mental health issues. As discussed, the precise nature and extent of those issues is unknown. However, those issues did apparently render respondent unfit to stand trial in her criminal case and required her to be remanded to DHS for treatment.

¶ 66    In finding maintenance was appropriate, the trial court considered relevant factors and determined that most of those factors weighed in favor of awarding maintenance to respondent. After reviewing the record, we find no abuse of discretion by the court.

¶ 67                    2. *Amount and Duration of Maintenance*

¶ 68    Next, we address respondent's challenge to the amount and duration of the trial court's maintenance award. Respondent argues the court erred in the amount of maintenance awarded because it improperly imputed income to her when the evidence showed she was "not employable." She also argues that, given her mental health issues and petitioner's substantial income and assets, the court should have granted her maintenance for a longer duration.

¶ 69    The Act sets forth specific provisions regarding the amount and duration of maintenance, providing for either a "guideline" or "non-guideline" maintenance order. 750 ILCS 5/504(b-1) (West Supp. 2019). Under the statutory guidelines, the amount of maintenance is calculated "by taking 33 1/3% of the payor's net annual income minus 25% of the payee's net annual income." *Id.* § 504(b-1)(1)(A). Relevant to this appeal, the Act's guidelines also provide

- 25 -

that the duration of maintenance is calculated by multiplying "the length of the marriage at the time the action was commenced" by the factor of 0.28. *Id.* § 504(b-1)(1)(B).

¶ 70　　　　As indicated, the trial court may elect to award non-guideline maintenance. *Id.* § 504(b-1)(2). If the court deviates from the applicable statutory guidelines, it must "state in its findings the amount of maintenance (if determinable) or duration that would have been required under the guidelines and the reasoning for any variance from the guidelines[.]" *Id.* § 504(b-2)(2).

¶ 71　　　　Like the propriety of a trial court's maintenance award, the amount and duration of maintenance are matters within the court's discretion. *In re Marriage of Selinger*, 351 Ill. App. 3d 611, 614, 814 N.E.2d 152, 157 (2004). On review, we examine the court's decision for an abuse of discretion. *Id.*

¶ 72　　　　As stated, respondent first argues the trial court erred in the amount of maintenance it awarded because it improperly imputed income to her when she lacked the ability to work. Again, she cites case authority for the proposition that to impute income to a party, the trial court must find that the party is voluntarily unemployed, attempting to evade a support obligation, or has unreasonably failed to take advantage of an employment opportunity. See *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 39, 83 N.E.3d 19 (affirming the imputation of income to a payee spouse based upon a finding of voluntary underemployment).

¶ 73　　　　 Here, the trial court's maintenance award was based upon calculations submitted by petitioner that followed statutory guidelines as to how the amount and duration of maintenance is calculated. Those calculations also imputed minimum wage income to respondent. However, the record fails to reflect any finding by the court that respondent was voluntarily unemployed or underemployed, or that she lacked income due to her failure to take advantage of any particular

employment opportunity. In its written order, the court did find that respondent was unable to work due to her incarceration. However, contrary to petitioner's suggestions on appeal, incarceration of a party is most properly compared to an *involuntary* loss of employment rather than one that is voluntary. *Nein*, 209 Ill. App. 3d at 1089 (Agreeing with out of state authorities, "which compared incarceration to an involuntary loss of employment" while also finding "that incarceration, as a foreseeable result of criminal activity, does not *ipso facto* relieve one of the obligation to pay child support"); See also *In re Marriage of Burbridge*, 317 Ill. App. 3d 190, 193, 738 N.E.2d 979, 982 (2000) (rejecting the contention that "as a matter of law incarceration is a form of voluntary unemployment").

¶ 74　　　　Accordingly, because the trial court determined respondent was unable to work and earn income due to her incarceration and because incarceration is comparable to an involuntary loss of employment, we find that the trial court abused its discretion by imputing income. We note that without the imputation of income to respondent, the amount of guideline maintenance increases from $5436 per month (or a lump sum of $114,156) to $5740 per month (or a lump sum of $120,540). As a result, we modify the trial court's order to reflect an award of maintenance based on a monthly sum of $5740.

¶ 75　　　　Second, respondent challenges the trial court's determination as to the duration of maintenance. She does not dispute that under the statutory guidelines the duration of maintenance was 21 months given the length of the marriage. Rather, she contends the trial court should have deviated from the statutory guidelines because of petitioner's substantial income and assets and her inability to become self-sufficient due to her mental health issues. In her request for relief, respondent asks for an order directing the trial court to enter an award of "life-time permanent

maintenance."

¶ 76    "An award of permanent maintenance may be appropriate where one spouse is not employable or is only employable at a lower income as compared to the parties' standard of living during the marriage." *In re Marriage of Price*, 2013 IL App (4th) 120155, ¶ 30, 986 N.E.2d 236. "Permanent maintenance may also be appropriate where one spouse raised and supported the family during a lengthy marriage." *Id.*

¶ 77    Here, the parties' marriage was not a lengthy one. They were married in August 2009, and petitioner commenced dissolution proceedings six years later in December 2015. In December 2017, the trial court entered an order dissolving the marriage. Prior to the marriage, both parties had graduated from medical school in India and had the ability to practice medicine there. After the marriage, *petitioner* supported respondent while she pursued her career goals in the United States. Further, although there currently exists a disparity in the parties' incomes, the evidence does not support respondent's assertion that she is unemployable or that she lacks the ability to become self-sufficient. As discussed,  respondent was educated and trained as a medical professional. The record also contains little evidence regarding the nature and extent of her mental health issues. As discussed, no evidence was presented that those issues were untreatable or that they would indefinitely prevent her from obtaining employment in the medical field or otherwise. Under the circumstances, we find no abuse of discretion by the court in following the statutory guidelines with respect to the duration of maintenance.

¶ 78                    3. *Lump Sum Maintenance*

¶ 79    Finally, on cross-appeal, petitioner challenges the trial court's order that he pay maintenance to respondent in a lump sum rather than by periodic, monthly payments. He contends

such an award was not warranted by the facts of the case and that the court abused its discretion because it failed to adequately consider the tax consequences associated with a lump sum award. Petitioner asserts that a lump sum award has a detrimental effect on him because he was not awarded enough liquid assets by the court to cover the award and will be forced to liquidate retirement and investment accounts, resulting in "significant tax penalt[ies]."

¶ 80          As indicated, the Act permits the trial court to "grant a maintenance award for either spouse in amounts and for periods of time as the court deems just." 750 ILCS 5/504(a) (West 2018). A court may "award maintenance in gross payable periodically or in a lump sum." *Blum v. Koster*, 235 Ill. 2d 21, 42, 919 N.E.2d 333, 346 (2009) (citing *In re Marriage of Freeman*, 106 Ill. 2d 290, 295, 478 N.E.2d 326, 328 (1985)). However, unless exceptional circumstances exist, periodic maintenance is the preferred form of maintenance. *In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112, ¶ 30, 115 N.E.3d 477. On review, the trial court's decision as to the form of maintenance will not be reversed absent an abuse of that discretion. *In re Marriage of D'Attomo*, 2012 IL App (1st) 111670, ¶ 25, 978 N.E.2d 277.

¶ 81          Initially, we note that on appeal petitioner fails to cite to any evidence or arguments he presented to the trial court regarding the issue of tax consequences resulting from the liquidation of marital assets. Therefore, it is unclear what evidence the trial court improperly neglected to consider when determining how maintenance should be paid. See *In re Marriage of Moll*, 232 Ill. App. 3d 746, 756, 597 N.E.2d 1230, 1236 (1992) (indicating that the tax consequences of a property distribution were speculative where neither party offered any evidence on the subject).

¶ 82          Petitioner asserts he was surprised by the court's decision to order maintenance in a lump sum because neither party had requested it. As a result, he suggests he was also surprised

that the subject of tax consequences was a relevant issue in the case. We disagree. First, the trial court clearly had the authority to order maintenance payable in a lump sum and the subject of tax consequences is explicitly identified as a maintenance factor for consideration under the Act. Thus, the subject of tax consequences relative to potential forms of maintenance was a foreseeable and relevant issue. Second, the subject of taxes was also relevant to matters of property distribution. As petitioner points out in his brief, the parties agreed they had marital assets of $364,356— approximately $304,000 of which was in the form of retirement and investment accounts. The value of those accounts was subject to allocation by the court to either party. Certainly, the liquidation of those assets and accompanying tax consequences were foreseeable possibilities. Ultimately, petitioner had the opportunity to present evidence for the trial court's consideration regarding potential tax consequences he faced. Where no evidence is presented on a subject, there is nothing for the court to consider aside from mere speculation.

¶ 83　　　More persuasive is petitioner's contention that a lump sum maintenance award was not warranted by the evidence presented. He contends that the circumstances of this case are unlike those cases where lump sum maintenance is "typically" ordered, *i.e.*, cases involving potential difficulties with a payor spouse.

¶ 84　　　We note "the overriding intent in awarding [maintenance] in gross is to buoy the recipient spouse's financial security by minimizing the risks inherent in a periodic alimony award." *Brandis v. Brandis*, 51 Ill. App. 3d 467, 471, 367 N.E.2d 162, 165 (1977). Such awards have been found appropriate "where periodic payments would not be feasible as where a paying spouse does not pay his bills or will not work, or is regularly intoxicated and refuses to work, or where the paying spouse's occupation is so hazardous that he might not be able to continue to produce

income." *Id.* Further justifications for lump sum awards include "a paying spouse's irregular income, the speculative nature of the spouse's work, and severe bitterness of feeling between the parties arising especially in those circumstances where the parties own property jointly." *Id.*

¶ 85    Here, the trial court stated it based its lump sum maintenance award on "the totality of the circumstances," including "the pending criminal charge[s], [v]isa status, [o]rder of [p]rotection, [r]elocation without notice of [p]etitioner and child, plus the disparity in financial opportunities between the parties." Ultimately, however, we agree with petitioner that the evidence presented did not provide a sufficient basis for such an award. Specifically, no evidence was presented that petitioner refused to work or pay his bills. He was continuously employed in a non-hazardous profession with a stable income. Petitioner provided funds to respondent even when not required to do so by court order. Although the case involved allegations of abuse and an order of protection, there was no evidence of "severe" bitterness between the parties or that they owned property together. Further, the record fails to indicate that petitioner would disobey court orders to pay maintenance to respondent or that he somehow could not continue with periodic maintenance payments in the event that respondent is deported to India. Thus, we find periodic maintenance payments were feasible in this case and the court abused its discretion by awarding lump sum maintenance instead.

¶ 86                                    III. CONCLUSION

¶ 87    For the reasons stated, we modify the trial court's order to reflect an award of maintenance in a monthly sum of $5740 to be made as periodic payments for the duration ordered by the court—21 months. We otherwise affirm the court's judgment.

¶ 88    Affirmed as modified.